UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| LISA BATISTE-SWILLEY<br>          Plaintiff,<br>v.<br><br>CITY OF BATON ROUGE, *et al.*<br><br>          Defendants, | No. 3:17-cv-00443-SDD-EWD |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT:**

*Factual Basis*

As set forth in the statement of uncontested facts, and the exhibits annexed thereto, plaintiff Lisa Batiste had the bad luck to be renting a home at 602 France Street on July 10, 2016, when a mob of protesters intent on overtaking the interstate system congregated in front of her home. Ms. Batiste did not talk to the protesters about their intentions, and mistakenly believed this to be a permitted protest. As more police arrived, she became nervous on behalf of the protesters, some of whom were former students of hers. In a neighborly gesture, she invited many of them to occupy her yard, not understanding that the protesters' failure to disperse was actually a violation of the law, and did not recognize the easy access to France Street, westbound, as an avenue of retreat available to the protesters. When sufficient law enforcement had gathered to disperse the crowd, law enforcement entered the yard, arresting some protesters, and allowing others to depart the area voluntarily. Ms. Batiste and her family members were on the front porch, where deputies from the Calcasieu Parish Sheriff's Office Mobile Field Force approached her, and may have shoved her

back into her home. The best estimate available is that the police officers, from various agencies, were in the yard or on the porch for a few minutes, and did not occupy her property. Their goal was to move this crowd out of the area, away from easy access to the interstate, and to reopen East Boulevard and France Street. If this response was not perfect, it was good enough, and whatever mistakes were made were the sort that reasonable people can make during split-second high-pressure decisions.

*Law & Argument*

*Summary Judgment*

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Rule 56). If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Id. A factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Beck v. Somerset Technologies, Inc.*, 822 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)).

The allegations of the Second Amended Complaint (ECF Doc. 219) are plainly contrary to the video and photographic evidence that has been compiled through consolidated discovery in this and related cases.[1] Defendants herein respectfully suggest that the evidence will meet the

---

[1] Specifically, the July 10, 2016 protest cases, Geller v. City of Baton Rouge, 17-CV-324-JWD-EWD, Imani v. City of Baton Rouge, 17-CV-439-JWD-EWD, and Smith v. City of Baton Rouge, 17-CV-436-JWD-EWD.

standard set forth in *Scott v. Harris*,[2] such that plaintiff's version of events is "so utterly discredited" by video evidence that no reasonable jury could have believed her.

*Official Capacity Claims*

Plaintiff has named as defendants the City of Baton Rouge and Parish of East Baton Rouge (ECF Doc. 219 at paragraphs 17, 18). Plaintiff has named current Chief Murphy J. Paul as a defendant in his official capacity only (ECF Doc. 219 at paragraph 34). Various current and former City/Parish officials are named in their individual and official capacities, including former Mayor Melvin "Kip" Holden, former Chief Carl Dabadie Jr., Lieutenant James Darron Leach, and former assistant Chief David Hamilton (ECF Doc. 219 at paragraphs 21, 23, 28, and 29, respectively).

*Individual Defendants*

While the plaintiff has agreed to voluntarily dismiss many defendants, a number remain as to whom the allegations of the petition are contrary to the testimony received through depositions and the photographic and video evidence produced in discovery. The pleadings show generalized and conclusory allegations against seven defendants, which make assumptions about those officers' location, ability to observe alleged violations, and which are contrary to the sworn testimony and/or video evidence.

As set forth in the statement of uncontested facts, the allegations against defendants Brandon Blackwell, Nicholas Collins, Alan Hamilton, Jeffrey Pittman, Kama Roussell, Joe (Reab) Simoneaux, Jr., James Thomas, and Billy Walker, III, are contradicted by the evidence. Officers Blackwell, Simoneaux, and Walker were all on Government Street, without line of sight to the

---

[2] 550 U.S. 372, 380, 127 S.Ct. 1769 (2007), examined in detail in Day v. City of Baton Rouge, 17-CV-328-EWD, at ECF Doc. 145, Pg. 7-8.

property at the operative moment, and did not interact with Ms. Batiste-Swilley. Officers Collins, Hamilton, Pittman, and Thomas, were in the general vicinity, but do not appear to have entered the property, were clearly occupied with other tasks, or did not view any violation that triggered a duty to intervene. Finally, Officer Roussell did enter the yard, but made no arrests, and appears to have had no interaction with Ms. Batiste-Swilley, her family members, or family friends.

*No Underlying Constitutional Violation*

Plaintiff asserts violation of her Constitutional rights by:

1. Entry onto her property in violation of her Fourth Amendment rights;[3]
2. "Quartering" of militarized officers in violation of the Third Amendment;[4]
3. First Amendment violation by "retaliatory invasion" of her property;[5] and
4. Failure to intervene to prevent violation of Constitutional rights.

As shown below, none of these violations occurred, without which, there is no liability under 42 U.S.C. 1983, and no municipal liability.[6] No duty to intervene attaches unless "the officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'"[7]

*Qualified Immunity*

---

[3] Defendants herein adopt by reference the law and argument cited by the Louisiana State Police Defendants in their Motion for Summary Judgment as to Fourth Amendment Violations, ECF Doc. 251-1 at Pages 15-17.
[4] Defendants herein adopt by reference the law and argument cited by the Louisiana State Police Defendants in their Motion for Summary Judgment as to Third Amendment Violations, ECF Doc. 251-1 at Page 17.
[5] Defendants herein adopt by reference the law and argument cited by the Louisiana State Police Defendants, to the extent applicable, in their Motion for Summary Judgment as to First Amendment Violations, ECF Doc. 251-1 at Pages 17-18.
[6] ECF Doc. 189, at Pg. 12 (1983 conspiracy), Pg. 15 (*Monell* or municipal liability)
[7] ECF Doc. 189, at Pg. 5-6, citing *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (citations omitted).

Defendants herein adopt by reference the law and argument cited by the Louisiana State Police Defendants in their Motion for Summary Judgment as to qualified immunity.[8] As set forth in the statement of uncontested facts, this incident was a rogue protest, with the intention to overtake the interstate. It was not a peaceful protest, the agencies involved were caught off guard, and the law enforcement response was a hurried, tense, thing.

As this Court has explained:

> Qualified immunity provides government officials performing discretionary functions with a shield against civil damages liability, so long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation,' . . . it is effectively lost if a case is erroneously permitted to go to trial. The doctrine of qualified immunity was created to balance the interest of compensating persons whose federally protected rights have been violated against the fear that personal liability might inhibit public officials in the discharge of their duties."
>
> In determining whether an official enjoys immunity, we ask (1) whether the plaintiff has demonstrated a violation of a clearly established federal constitutional or statutory right and (2) whether the official's actions violated that right to the extent that an objectively reasonable person would have known. Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.[9]

The officers have the right to make a limited entry into private property to effect arrests or disperse a crowd that appears to be on the verge of a riot. There was no demand for food and lodging to satisfy a claim of "quartering," and the brief entry into the plaintiff's yard and curtilage does not meet any reasonable defining of quartering. The putative purpose of the protest, against police misconduct, was not the reason for dispersing the crowd or arresting protesters, it was the imminent threat to overtake the interstate, creating hazardous conditions for all parties. Defendants would further suggest that Ms. Batiste lacks standing to assert Fourth Amendment claims or

---

[8] ECF Doc. 251-1 at Pg. 11-15.
[9] ECF Doc. 189, at Pg. 5-6, citations omitted.

excessive for claims as to anyone other than herself, such that any claims asserted on behalf of protesters in the yard, or her adult child or guest, are invalid.

Consolidated discovery in the related protester suits have resulted in roughly ninety depositions (excluding outlier suits, such as *A.R. v. City of Baton Rouge*), hundreds of videos and photographs, and thousands of pages of documentary discovery. Despite that outpouring of effort, the plaintiff cannot show that the officers acted unreasonably on Sunday, July 10, 2016, as to her.

<u>COUNT 1 – 42 U.S.C. Section 1983 Civil Conspiracy to Violate Civil Rights</u>

The applicable law is set forth by this Court in the Second Oral Argument Notice (ECF Doc. 189) at pages 12-13. Plaintiff cannot prevail here, because there was no deprivation of rights, and no agreement to commit such a deprivation. The best recollection, and evaluation of the evidence, is that Ms. Batiste-Swilley was deprived of the use of her yard and porch for less than ten minutes.[10] It is not beyond the scope of judicial notice that municipal bureaucracies will take any excuse to hold a meeting, and the mere allegation that meetings were held does not create an inference of conspiracy. The evidence presented is that there was no agreement to violate civil rights as to the plaintiff, or any class of citizens.[11] Chief Dabadie and Mayor Holden gave no instructions to arrest, merely observed from a distance.[12]

If there is no underlying violation of rights, there can be no conspiracy to violate those rights, and if the defendants are entitled to qualified immunity, the conspiracy claim is not actionable.[13]

---

[10] Statement of uncontested facts, Paragraph 22.
[11] Statement of uncontested facts, Paragraph 27.
[12] Statement of uncontested facts, Paragraph 17.
[13] ECF Doc. 189, at Pg. 12, citing *Morrow v. Washington*, 672 F. App'x 351, 355 (5th Cir. 2016) and *Hale v. Townley*, 45 F.3d 914,21 (5th Cir. 1995).

*COUNT 2 – 42 U.S.C. 1985(3) Claim for Racially-Motivated Civil Conspiracy to Deny Black Citizens and Residents the Equal Protection of the Laws and Equal Privileges and Immunities Under the Law, Including the Right to Associate and Assemble and the Right to Petition the Government for Redress of Grievances*

To prevail on a claim under Section 1985(3), plaintiffs must establish four elements:

(1) a conspiracy;

(2) to deprive the plaintiff of the equal protection of the laws;

(3) an act in furtherance of the conspiracy; and

(4) a resulting injury.[14]

The proof of conspiracy alleged is conclusory allegations of the petition without substantive support. The Statement of Uncontested Facts and exhibits uniformly show that the leadership of the City/Parish did not direct the police department to engage in any particular activity, that there was no agreement between agencies to discriminate, and that the detention and arrest of the protesters resulted from their (1) blocking the roadways, (2) intention to further block the roadways by occupying the interstate and/or (3) failure to disperse after being commanded to do so. The City/Parish defendants clearly supported the planned protest and march from Wesley United Methodist Church to the state capitol, such that the organizers contacted the City/Parish, the City/Parish waived the usual permit requirements for such marches, provided traffic and lane closures, and security for the participants.

The breakaway group of hundreds, blocking all four lanes of Government Street, marching towards I-110, with the known and stated intention to occupy the interstate, is not a peaceful

---

[14] *United Broth. of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-29, 103 S. Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983).

protest.[15] Forming a human chain across the roadway and interfering with police detention of others[16] is not "engaging in non-disruptive speech in support of an issue of pressing public importance." Holding the line for an hour and a half, refusing to disperse, and hurling projectiles at law enforcement, is not a peaceful protest.[17]

<u>COUNT 3 – 42 U.S.C. 1983 Entry of Private Property Without a Warrant or Probable Cause or Justification in Violation of the Fourth and Fourteenth Amendments</u>

Law enforcement commonly enters private property, briefly, to investigate, detain, or arrest, without violation of the Fourth Amendment. As explained by this Court[18]:

> The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *United States v. Hunt*, 253 F.3d 227, 230 (5th Cir. 2001) (quoting U.S. Const. amend. IV). "The essential purpose of the Fourth Amendment is to impose a standard of 'reasonableness' upon law enforcement agents and other government officials in order to prevent arbitrary invasions of the privacy and security of citizens." Id. (citing *Delaware v. Prouse*, 440 U.S. 648, 653–654, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979)).
>> To determine whether a defendant has a reasonable expectation of privacy in his front yard or driveway, the Supreme Court stated:
>>> The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself. The concept plays a part, however, in interpreting the reach of the Fourth Amendment. *Hester v. United States*, 265 U.S. 57, 59, 44 S. Ct. 445, 446, 68 L. Ed. 898 (1924), held that the Fourth Amendment's protection accorded "persons, houses, papers, and effects" did not extend to the open fields, the Court observing that the distinction between a person's house and open fields "is as old as the common law. 4 Bl. Comm. 223, 225, 226."
>>> We reaffirmed the holding of *Hester* in *Oliver v. United States*, supra. There, we recognized that the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself. 466 U.S., at 180, 104 S. Ct., at 1742. We identified the central component of this inquiry as whether the area harbors the "intimate activity

---

[15] Statement of uncontested facts, Paragraphs 3-7, 11.
[16] Statement of uncontested facts Paragraph 15.
[17] Statement of uncontested facts, Paragraph 12, 13, 18.
[18] *United States of America v. Julian Martinez-Velazquez*, 19-CR-157-JWD-EWD, ECF Doc. 47, Ruling and Order, at Pg. 9-10.

> associated with the 'sanctity of a man's home and the privacies of life.' " Ibid. (quoting *Boyd v. United States*, 116 U.S. 616, 630, 6 S. Ct. 524, 532, 29 L. Ed. 746 (1886)).
>
> Drawing upon the Court's own cases and the cumulative experience of the lower courts that have grappled with the task of defining the extent of a home's curtilage, we believe that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.
>
> *United States v. Dunn,* 480 U.S. 294, 300–01, 107 S. Ct. 1134, 1139, 94 L. Ed. 2d 326 (1987).

As shown by the video and photographic exhibits, Ms. Batiste's yard is only partially fenced and generally open to observation from passers by on foot or by vehicle. In the absence of a railing or gate at the top of the stairs, the occupants "could not have reasonably expected to keep neighbors, door-to-door salespeople, and trick or treaters from driving or walking to his house and approaching his front door. It follows therefrom that if he has a reasonable expectation that various members of society may enter his property, he should find it equally likely that the police […] will do so."[19]

COUNT 4 –42 U.S.C. 1983 Quartering Militarized Officers in Violation of the Third and Fourteenth Amendments

The Third Amendment to the United States Constitution provides:

> No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.

Defendants would request that the Court use the same analysis expressed in the August 19, 2020, motion to dismiss[20] as to the Third Amendment claim asserted by the plaintiff. As noted

---

[19] *USA v. Martinez-Velazquez*, supra, at Pg. 11, citing *United States v. Moffitt*, 233 F. App'x 409, 411-412 (5th Cir. 2007).
[20] Transcript of August 19, 2020, Pg. 49:12-51:6.

above, it appears that the officers, from all agencies, were on Ms. Batiste's property for ten minutes or less. There is no evidence to support a demand for food or lodging by and for any law enforcement officers from Ms. Batiste.[21]

## COUNT 5 – 42 U.S.C. 1983 Retaliatory Invasion of Property in Violation of First Amendment Rights

The First Amendment to the United States Constitution generally "prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722, 204 L. Ed. 2d 1 (2019)(citing *Hartman v. Moore*, 547 U.S. 250, 256, 126 S. Ct. 1695, 164 L.Ed.2d 441 (2006))(internal quotations omitted). A First Amendment claim is the appropriate manner by which to seek relief for such a retaliatory action. *Id.* A plaintiff asserting such a claim must show (1) that he was injured by the official's action, (2) that the official had a retaliatory motive, and (3) that the retaliatory motive was a "but-for" cause of the injury – in other words, the action against the plaintiff would not have been taken absent the motive. *Id.*

> As explained by Justice Goldberg:
>
> > The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection. **One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form**

---

[21] Statement of uncontested facts, Paragraph 22.

> **of freedom of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations.**
> (*Cox v. Louisiana*, 379 U.S. 536, 558, 85 S.Ct. 453 (1965), at 554-555, citations omitted, emphasis added.)

Ms. Batiste was under a mistaken belief that:

1. This was a permitted march or protest;

2. There was no avenue of escape for the protesters;

3. Allowing the protesters to congregate in her yard meant that they were no longer violating the law, or that they could not be arrested for earlier violations.

BRPD command was concerned that the protesters would try to block the interstate, as they had already blocked Government Street. The content of their communication was not the issue – it was purely public safety. Many protesters departed voluntarily, and were not arrested. However, there was no way to secure the interstate without getting this group of people to depart the area. Regardless of Ms. Batiste's erroneous understanding of the situation and the law, the detention of protesters in her yard and push to disperse the protesters in general was a purely tactical and safety oriented decision, without regard to the speech engaged in.

## COUNT 6 – 42 U.S.C. 1983 Failure to Intervene

The 5th Circuit has accepted that an officer may be liable under § 1983 when he is present at the scene of a constitutional violation by another officer and "does not take reasonable measures to protect" a person from the other officer's violation of the person's constitutional rights.[22] This

---

[22] *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013); see also *Hale v. Townley*, 45 F.3d 914 (5th Cir. 1995); *Sanchez v. City of Chicago*, 700 F.3d 919, 926 (7th Cir. 2012); *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 416–19 (4th Cir. 2014).

theory of liability against officers "most often applies in the context of excessive force claims, [but] other constitutional violations also may support a theory of bystander liability."[23]

Generally, to prevail on a failure to intervene/bystander liability claim against an officer, the plaintiff must prove that the defendant officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) is present at the scene of the constitutional violation; (3) has a reasonable opportunity to prevent the harm; and (4) chooses not to act.[24]

Plaintiff's claim fails on multiple points. First, by the absence of Constitutional violation, as set forth above.[25] Second, by mis-identification of officers who were not in the area, or were otherwise not in a position to observe the alleged violation or take action.[26] Finally, the plaintiff implies and assumes a choice not to act, even though dozens of officers deposed in the related protester cases have acknowledged their duty to intervene. There is no evidence to support this implication, apart from the conclusory allegations of the complaint.

## COUNT 7 – Monell Claim for Municipal Liability for Violation of Plaintiff's Civil Rights

This Court has set forth the law for municipal liability for 42 U.S.C. 1983 claims.[27] As the Court noted, "The Supreme Court has explained that a municipality cannot be liable '[i]f a person has suffered no constitutional injury at the hands of the individual police officer.'"[28] Without that underlying Constitutional violation, there can be no municipal liability. As set forth above, there is no cognizable Constitutional violation, and plaintiff cannot meet her burden of proof.

---

[23] *Whitley*, 726 F.3d at 646 n.11.
[24] *Whitley*, 726 F.3d at 646.
[25] See also, statement of uncontested facts, Paragraph 30.
[26] See statement of uncontested facts, Paragraphs 28, 32, 33, 34, 35.
[27] ECF Doc. 189, at Pg.15-16.
[28] ECF Doc. 189, at Pg.15, citing *Bustos v. Martini Club Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571 (1986))

Causation, "moving force" causation, is also required. The situation encountered here, where law enforcement was entirely outnumbered, and caught by surprise, indicates that this was civil disorder, and not a planned or noticed protest. The plaintiff's insistence that this unruly mob was comparable to the planned peaceful protest at the state capital earlier in the day is absurd. This is the definition of civil disorder, and the policies of the Baton Rouge Police Department as to unusual occurrences and civil disorder were the correct framework with which to address this incident.

COUNT 8 – Supplemental State Law Claims for Civil Conspiracy to Violate Plaintiff's Rights

Defendants suggest that the applicable law is set forth by this Court in the Second Oral Argument Notice (ECF Doc. 189) at page 16. Plaintiff's claim fails here on the absence of injury, as at worst, she alleges a technical battery, without injury.[29] There is no evidence of an agreement to commit any torts against Ms. Batiste-Swilley, which is the other element of the civil conspiracy.

COUNT 9 – Supplemental State Law Claims for Violation of the Right to Property

The Louisiana Constitution, Article 1, Section 4, provides in pertinent part:

> Section 4. (A) Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. **This right is subject to** reasonable statutory restrictions and **the reasonable exercise of the police power**.
> (B)(1) Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit.
> (2) As used in Subparagraph (1) of this Paragraph and in Article VI, Section 23 of this Constitution, "public purpose" shall be limited to the following:
> (c) **The removal of a threat to public health or safety caused by the existing use or disuse of the property.**
> (Emphasis Added)

---

[29] Deposition of Lisa Batiste-Swilley, Pg. 58:7-59:10, 64:11-16.

<u>COUNT 10 – Supplemental State Law Claims for Violation of the Right to Assembly Protected by the Louisiana</u>

The Louisiana Constitution, Article 1, Section 9, provides:

> No law shall impair the right of any person to assemble peaceably or to petition government for a redress of grievances.

*State v. Bulot*, 175 La. 21, 142 So. 787 (1932), while admittedly decided under the Constitution of 1921, held that the statute in question was not invalid for vagueness in its prohibition of "unlawfully assemble for any unlawful purpose." The statute was struck because it permitted the dispersal of crowds that were peaceably assembled for an unlawful purpose.

As noted in the statement of uncontested facts, and throughout this motion, this was not a peacefully assembled crowd. Its intentions were anarchic, its behavior violent, and if it was not riotous, it had sufficient potential for riot to warrant dispersal.

<u>COUNT 11 – Supplemental State Law Claims for Violation of the Right to Privacy, the Right to be Left Alone, and the Right to Freedom from Intrusion</u>

In *Shane v. Par. of Jefferson*, 2014-2225 (La. 12/8/15), 209 So. 3d 726, the Louisiana Supreme Court had to evaluate competing Constitutional interests in the rights of privacy, of association, and the interest of the public in governmental affairs. Considering the nature of the rights guaranteed by the Louisiana Constitution, the Court explained:

> Article I, Section 5, of the Louisiana Constitution states: "Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy."
> The right to privacy in Louisiana has been described as the right to be "let alone" and to be free from unnecessary public scrutiny. *Capital City Press v. East*

> *Baton Rouge Parish Metropolitan Council*, 696 So.2d at 566; *DeSalvo v. State*, 624 So.2d at 901. The right of privacy protects varied interests from invasion; among the interests protected is the individual's right to be free from unreasonable intrusion into his seclusion, solitude, or into his private affairs. *Capital City Press v. East Baton Rouge Parish Metropolitan Council*, 696 So.2d at 566.
>
> However, the right to privacy, like other personal rights, may be lost in many ways, by express or implied waiver, consent, or by a course of conduct that prevents its assertion. Id. The right is not absolute; it is qualified by the rights of others. Id. The right of privacy is also limited by society's right to be informed about legitimate subjects of public interest (e.g., individuals involved in civil litigation may be compelled to give evidence, which tends to embarrass them or to produce documents of a confidential nature, and a debtor's right of privacy is subject to the creditor's right to take reasonable steps to collect his debt). *Copeland v. Copeland*, 966 So.2d at 1046; *Capital City Press v. East Baton Rouge Parish Metropolitan Council*, 696 So.2d at 566; *Plaquemines Parish Commission Council v. Delta Development Company, Inc.*, 472 So.2d 560, 567 (La.1985).
>
> Article I, Section 5, of the Constitution applies only where one has a reasonable expectation of privacy in the matter sought to be protected. The test for determining whether one has a reasonable expectation of privacy, which is constitutionally protected, is not only whether the person had an actual or subjective expectation of privacy, but also whether that expectation is of a type that society at large is prepared to recognize as being reasonable. *Capital City Press v. East Baton Rouge Parish Metropolitan Council,* 696 So.2d at 566.
>
> (*Shane*, supra, at 740-741)

Defendants would suggest that the critical questions, as regards plaintiff's claim here, are whether the act of harboring a mass of protesters as law enforcement demands their departure over the course of an hour serves to waive one's right to privacy, and whether that position, however nobly intended, is reasonable? Defendants would set forth that harboring what amounted to fugitives is a tacit waiver of that right to be left alone, and that noble intentions, coupled with a misunderstanding of the law, and the status of one's guests, can make that decision unreasonable to society at large.

COUNT 12 –   *Supplemental State Law Claims for Intentional Torts, Including Trespass to Land*

State law claims for trespass have their roots in Louisiana Civil Code Article 2315, the general tort basis. Louisiana's First Circuit explains:

> Article 2315 of the Civil Code provides in pertinent part that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. The tort of trespass has long been recognized by courts throughout this state as a means to correct the damage caused when an owner is unjustly deprived of the use and enjoyment of his immovable.
> (*Britt Builders, Inc. v. Brister*, 618 So.2d 899, 903 (La.App. 1 Cir.1993))

A trespasser has been defined as "one who goes upon the property of another without the other's consent."[30] A trespass occurs when there is an unlawful physical invasion of the property or possession of another.[31]

In a criminal context, La. R.S. 14:63.3, Entry on or remaining in places or on land after being forbidden, provides in pertinent part:

> A. (1) No person shall **without authority** go into or upon or remain in or upon or attempt to go into or upon or remain in or upon any structure, watercraft, or any other movable, or immovable property, which belongs to another, including public buildings and structures, ferries, and bridges, or any part, portion, or area thereof, after having been forbidden to do so, either orally or in writing, including by means of any sign hereinafter described, by any owner, lessee, or custodian of the property or by any other authorized person.
> (Emphasis Added)

The distinction sought here is found in civil trespass and criminal trespass, namely the authority to enter the property. As shown above, a brief entry into private property by law enforcement, with probable cause, to investigate, detain, or even arrest, is not offensive to the Constitution, and appears to be the lawful physical invasion of the property possessed by another. To hold otherwise would prevent valid and valuable law enforcement activities, for instance, a foot chase across an open yard, or retrieving stray animals or children.

## *Conclusion*

Ms. Batiste could have applied for compensation for damage to her porch, but chose to frame her damages as a violation of civil rights. Her beliefs regarding the protest and protesters

---

[30] *Pepper v. Triplet*, 03–619 (La.1/21/04), 864 So.2d 181, 197 (citations omitted).
[31] *Gaspard v. St. Martin Parish Sewerage Dist. # 1,* 569 So.2d 1083 (La.App. 3 Cir.1990).

were mistaken, though admirable. She suffered no physical damage, and no violation of her civil rights to support her varied Federal claims. No warrant was required, and if the warrantless arrest for a misdemeanor is to be made promptly, that evaluation is situational. Promptly can easily mean "as soon as there are enough officers on scene to safely effect an arrest," which is what happened here. Ms. Batiste is the victim of circumstance and bad luck, not overreaching governmental agents. Her claims lack merit, and must be dismissed, at her cost, as a matter of law.

By Attorneys:
Anderson O. Dotson
Parish Attorney

**/s/ Joseph K. Scott, III**
**Joseph K. Scott, III (#28223)**
**Deelee S. Morris (Bar Roll #28775)**
**A. Gregory Rome (#21062)**
**222 St. Louis Street, 9th Floor**
**Baton Rouge, LA 70802**
**Telephone: (225) 389-3114**
**Facsimile:   (225) 389-8736**
**Email:** jkscott@brla.gov
**Email:** dsmorris@brla.gov
**Email:** grome@brla.gov

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| LISA BATISTE-SWILLEY<br>    Plaintiff,<br>v.<br><br>CITY OF BATON ROUGE, *et al*.<br><br>    Defendants, | No. 3:17-cv-00443-SDD-EWD |

### CERTIFICATE OF SERVICE

  I hereby certify that a copy of the foregoing *Memorandum in Support of Motion for Summary Judgment* was this date electronically filed with the Clerk of Court using the Court's CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.  Notice will be mailed to any party or counsel not participating in the Court's CM/ECF system by this date depositing same in the United States Mail, first class postage prepaid, and properly addressed.

  Baton Rouge, Louisiana this 18th  day of February, 2022.


                 */s/ Joseph K. Scott, III*
                **JOSEPH K. SCOTT, III**